IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 8, 2013

IN RE JAKAEHA A. L.,[1]
ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 127909      Timothy E. Irwin, Judge**

**No. E2012-02272-COA-R3-PT - Filed June 18, 2013**

This is a parental rights termination appeal.  The Department of Children's Services petitioned to terminate the parental rights of the mother[2] to her daughters, ages three and one. The ground alleged was severe child abuse against a half sibling for which the mother was sentenced to more than two years imprisonment.  After conducting a hearing, the trial court terminated the mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(4) and (5) upon finding that termination was in the best interest of the children.  The mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Meghan A. King, Knoxville, Tennessee, for the appellant, Ebony C. L.

Robert E. Cooper, Jr., Attorney General & Reporter, and Marcie E. Greene, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

John W. Stephenson, Knoxville, Tennessee, Guardian ad Litem.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

[2]The birth certificates for these children do not reflect the name(s) of the father(s).

## OPINION

## I. BACKGROUND

On June 6, 1996, Deja M. L. died from shaken baby syndrome. Deja was approximately five months old at the time of her death. Her injuries included brain damage, a broken left leg, a broken rib, and bruising all over her back. Her mother, Ebony C. L. ("Mother") and Deja's father were indicted for aggravated child abuse, first degree murder, and felony murder. Although Mother initially blamed her mother ("Grandmother") and then Deja's father for the abuse, she eventually confessed to shaking Deja on the night of the child's death. On October 28, 1998, in Shelby County Criminal Court, Mother pled guilty to aggravated child abuse and voluntary manslaughter and was sentenced to twelve years imprisonment. Upon her release in 2006, Mother moved to Knoxville. On April 28, 2010, Mother gave birth to another daughter, Jakaeha A. L. ("Jakaeha").

In 2011, Valencia Scott, Mother's aunt, filed a petition for custody of Jakaeha. Ms. Scott alleged that she had been and continued to be Jakaeha's primary caretaker. A guardian *ad litem* was appointed for Jakaeha and a dependency and neglect petition was filed. The Department of Children's Services ("DCS") determined that Jakaeha had been living in Ms. Scott's custody for a lengthy period of time. In November 2011, the trial court adjudicated Jakaeha dependent and neglected and placed her in DCS' custody. The court based its finding on Mother's previous convictions for child abuse and her lack of the necessary resources to care for Jakaeha. At that time, Mother was unemployed, did not have any financial resources, and did not have stable housing.

DCS unsuccessfully attempted to place Jakaeha with relatives – Ms. Scott, a family friend, and a cousin all filed unsuccessful petitions for custody.[3] DCS concluded it could not place Jakaeha with Grandmother because she had a previous felony conviction for armed robbery and because Mother lived in that home. On February 22, 2012, the petition to terminate Mother's parental rights to Jakaeha was filed.

A little over a month later, on March 30, 2012, Mother gave birth to Armani S. L. ("Armani") (with Jakaeha, collectively "the Children"). Due to Mother's continued involvement with DCS and her previous abuse conviction, the trial court immediately found Armani to be dependent and neglected and placed her in the same foster home as Jakaeha. The petition to terminate Mother's parental rights to Armani was filed on May 24, 2012.

---

[3]The record reflects "there are very high levels of conflict between family members, as well as frequent accusations of severe psychological and social dysfunction across family members."

Jakaeha was very sick when she was initially placed in foster care. She exhibited extreme mood swings and aggressive behaviors that raised concerns about whether she had been exposed to violence while living with Mother. One example cited was that Jakaeha pretended to stab her baby doll with the silverware and plastic knives from her play kitchen. Other worries were that Jakaeha may have had attachment or sensory issues. To address these matters, DCS arranged for Jakaeha to be evaluated for any developmental delays and to begin play therapy.

During an August 2012 psychological evaluation with Dr. James F. Murray, Mother denied responsibility for Deja's death and related that unfair circumstances necessitated her entering a guilty plea. She reported that Grandmother had emotionally, physically, verbally, and sexually abused her when she was a child. She indicated that Grandmother's boyfriend raped her. She also stated that Grandmother uses drugs and alcohol and cannot care for herself – she admitted having no place else to go but Grandmother's home where a great deal of fighting and arguing occurs. Grandmother however denied all of Mother's accusations and testified that her daughter had lied during the psychological evaluation. Dr. Murray concluded that Mother displayed "significant signs of major psychological disturbance in the form of paranoia, depression, anxiety, chronically impaired social and interpersonal functioning, and limited capacity to adequately care for herself." He opined that these factors reflect strongly that Mother is unable to adequately care for the needs of the Children. He concluded it was not in the best interest of the Children to be with Mother.

David Potter, a DCS case manager for the Children, testified that Mother had never taken personal responsibility for Deja's death and had done nothing to resolve her mental health issues. He acknowledged that Mother engaged Jakaeha and often read books with her. Mr. Potter observed that Mother had difficulty engaging both of the Children at the same time. He testified that Mother "attends to Armani's needs from what [he's] observed." Shelee Smith, the first case manager for the Children, noted that Mother "was told before the visits . . . that she needed to provide for the [C]hild[ren]. She needed to bring diapers. She needed to bring food. We also let her know that she probably needed to bring toys or games to play with Jakaeha during the visits."

LeighAnne Goldstine, a licensed professional counselor and clinical manager at Foothills Care, conducted a bonding assessment. She monitored two visits between Mother and the Children. While Mother did focus on the Children during the initial visit, in Ms. Goldstine's opinion she spent the second visit preoccupied with her cell phone. In the counselor's view, Mother was not attentive to the Children's needs during these visits. Despite being told to bring diapers, wipes, formula, and bottles for Armani, she did not bring the items. She also did not bring any toys for Jakaeha, necessitating provision of playthings by DCS.

-3-

Prior to her visits, Mother was instructed to not bring sugary foods, but at the first one, she brought Jakaeha a chocolate-covered Honey Bun and a caffeinated soda. When Armani started crying during the visit and the foster mother had not left diapers, Mother became very upset and was unable to soothe the child. Ms. Goldstine ultimately had to intervene because Armani became distraught.

The second monitored visit, the day before the termination hearing, was scheduled to last for six hours. Ms. Goldstine had to end it early however because Mother did not bring formula for Armani. Mother brought a "Lunchable" snack for Jakaeha, but she gave it to her at 10:25 and instructed her to portion it out so that it would last for the entire six-hour visit. Mother failed to attend to Jakaeha's diapering needs during the visit. Approximately three hours into the visit, Ms. Goldstine inquired of Mother concerning Jakaeha's visibly soiled diaper. Mother stated that she had not checked the diaper because she was stressed. Further, she told the counselor that Jakaeha would let her know if she needed to go to the bathroom. When Mother finally checked the diaper, which was saturated with urine, she removed it and put Jakaeha's pants back on without another diaper or underwear.

Throughout the second visit, Mother was texting and calling individuals in an effort to find someone to bring her the necessary supplies. While Armani was asleep, Mother walked to a nearby discount store and purchased newborn diapers that were too small for the Children. When Ms. Goldstine inquired why newborn diapers had been purchased, Mother first stated that she did not have enough money to purchase bigger diapers; she then claimed that she had been unable to purchase any before the visit because no one told her what size to buy. Later in the visit, when Jakaeha accidently woke Armani up, Mother again was unable to calm her.

Ms. Goldstine acknowledged that Mother said A-B-C's, identified colors, named animals, and engaged in educational activities with the Children. She witnessed, however, behavior that indicated a lack of attachment between Mother and the Children. She noted that when Mother entered the building, she waved at Jakaeha but then went straight to the restroom before going directly to the desk to check in. Mother did not make eye contact with Jakaeha when she left the restroom and did not speak to her until after she had checked in at the desk. Ms. Goldstine observed that a mother with a good bond or attachment would have greeted the youth immediately upon entering the building. The counselor related that while Jakaeha appeared to know Mother and engaged with her, she managed her own time and was not affectionate with Mother. In Ms. Goldstine's opinion, Jakaeha did not display the type of affection toward Mother that one would typically see from a child her age who had an attached relationship with her parent or caregiver. She further noted that Armani's primary attachment was to the foster mother. She concluded that Mother presented with a disruptive adult detachment – focuses on unresolved issues from her past, blames others, fails

to take responsibility for herself or her actions, and fails to anticipate and meet the emotional and physical needs of the Children. In Ms. Goldstine's clinical opinion, Mother was unable to safely and appropriately mother the Children. She opined that before Mother could effectively bond with the Children, she would first need to accept responsibility for her parental shortcomings and role in the Children's removal and then enter counseling specifically focused on her detachment disorder. Ms. Goldstine concluded that Mother would not be able to assume a healthy attachment parenting style with the Children.

At the time of the termination hearing, Mother denied any responsibility for the Children's removal and remained unable to adequately care for the Children. Despite pleading guilty to aggravated child abuse and voluntary manslaughter in connection with Deja's death, Mother refused to take personal responsibility for that incident. She denied signing the affidavit from her criminal trial admitting her culpability and claimed Grandmother had abused Deja. She related that she accepted the plea deal only because she faced the death penalty. According to Mother, Deja's father had abused the child, but he worked a plea deal that left Mother taking the blame for her daughter's death. Mother testified that she had "blocked out" everything that happened during that time period.

Mother also continued to lack the necessary resources to care for the Children. She was unemployed at the time of the termination hearing and told Ms. Goldstine that she did not have the financial resources to provide diapers or other necessities. Mother lived with Grandmother when Jakaeha was removed and left that residence just prior to the termination hearing when she moved in with her boyfriend. Mother had only been with that boyfriend for a few months and was completely dependent on him for financial and emotional support. She would not disclose to DCS any identifying information about the boyfriend, other than his place of employment. Significantly, the boyfriend did not want to participate in Mother's bonding assessment or any other proceedings regarding the Children and was reluctant to allow Ms. Goldstine into his home for the assessment.

At the time of the termination hearing, the Children were in a pre-adoptive home. They were doing well in the home, and the foster parents desired to adopt them.

On September 28, 2012, the trial court found by clear and convincing evidence that Mother had committed severe child abuse against a half-sibling of the Children and had been sentenced to more than two years imprisonment for that abuse. The court further found that termination of Mother's parental rights was in the best interest of the Children. The trial court specifically determined that Mother had "not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [C]hildren's best interest to be in her home." The court further noted as follows:

[Mother] has done well for a person in prison that long, but she has done well because she has lots of family help to take care of her. They provided at least enough help to keep her out of trouble . . . .

. . . The factors the [c]ourt is asked to address here really go to the degree of risk. Respondent is not where she needs to be mentally. The passage of time alone cannot erase the events of 1996 or transform [Mother] from a mother who killed her child into a mother who can safely raise and nurture her child.

Mother timely filed this appeal.


## II. ISSUES

The following issues were raised on appeal:

Whether clear and convincing evidence supports the trial court's termination of Mother's parental rights to the Children pursuant to Tennessee Code Annotated section 36-1-113(g)(4) and (5).

Whether clear and convincing evidence supports the Juvenile Court's ruling that termination of Mother's parental rights was in the Children's best interest pursuant to Tennessee Code Annotated section 36-1-11(i).


## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair*

*v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

### A.[4]

The trial court terminated Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(4) and (5)(2010). Those provisions provide that a court may terminate parental rights when:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). A court also may terminate parental rights when:

> The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(5). "Severe child abuse" is defined as:

> The knowing exposure of a child to or the knowing failure to protect a child

---

[4] In her brief, Mother did not argue against the trial court's finding that proper grounds exist for termination of her parental rights. Trial counsel for Mother acknowledged that the grounds per the statute were established. Counsel asserted however that termination was not in the best interest of the Children.

from abuse or neglect that is likely to cause great bodily injury or death and the knowing use of force on a child that is likely to cause great bodily injury or death.

Tenn. Code Ann. § 37-1-102(b)(23)(A)(2011).

At the hearing, Mother testified as follows:

[A]ccording to my public defender in Shelby County, he told me that due to Demetrius [her boyfriend and Deja's father] pleading guilty before me, that killed any chances of me defending myself by going to trial. He said that I didn't have a strong case going to trial alone, even though the evidence – the physical evidence pointed to him . . . and I felt like I didn't have no choice, because when they offered me the death penalty or life in prison, I panicked and I felt like I didn't have a choice, so I took the deal.

On October 28, 1998, Mother pled guilty to aggravated child abuse and voluntary manslaughter and was sentenced to twelve years imprisonment without the possibility of parole. In pleading guilty to these crimes, Mother admitted that she knowingly abused Deja, *see* Tenn. Code Ann. §§ 39-13-211, 39-15-401 and 39-15-402, and that she was responsible for shaking Deja on the night that she died. Accordingly, the trial court properly found that termination of Mother's parental rights was proper. The record in this matter established the grounds for termination pursuant to Tennessee Code Annotated 36-1-113(g)(4) and (5).

**B.**

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or

guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36-1-113(i) (2010). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude

that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

As to her ability to meet the Children's physical needs, Mother asserts there is a discrepancy between the opinion of Mr. Potter of DCS and Ms. Goldstine. Mother contends that Mr. Potter found that she "attends to Armani's needs from what [he's] observed." Mother argues this discrepancy renders the evidence less than "clear and convincing."

As found by the trial court, a number of the best interest factors weighed against Mother. She failed to effect a lasting adjustment despite the efforts of DCS and mental health providers. *See* Tenn. Code Ann. § 36-1-113(i)(1) and (2). Her mental and/or emotional status also would be detrimental to the Children and prevent her from providing safe and stable care for the Children. *See* Tenn. Code Ann. §36-1-113(i)(8). Although the psychological assessment revealed that Mother displayed significant signs of major psychological disturbance in the form of paranoia, depression, and anxiety, she did not provide DCS any records establishing that she had participated in mental health counseling to resolve those issues.

Mother never provided diapers or wipes for the Children, did not bring formula or bottles for Armani or appropriate snacks for Jakaeha despite being instructed to bring them, did not appropriately attend to the Children's diapering needs during visits, and had difficulty caring for both the Children at the same time. Mother admitted that she did not have the financial resources to provide the necessary supplies for the Children, but she remained unemployed and blamed DCS. Mother did not pay child support. *See* Tenn. Code Ann. § 36-1-113(i)(9). At the time of the hearing, she was completely dependent on a new boyfriend for both financial and emotional support.

Mother had also shown brutality, physical abuse, and neglect toward the Children's half-sibling, Deja. *See* Tenn. Code Ann. § 36-1-113(i)(6). She admitted in 1998 that she shook her infant daughter, resulting in Deja's death, and that there was evidence of prior abuse. Mother pled guilty to aggravated child abuse and voluntary manslaughter for her role in Deja's death. The record clearly reveals that Mother did not have a meaningful relationship with these Children and a change in caretakers would have a negative effect on them. *See* Tenn. Code Ann. § 36-1-113(i)(4) & (5).

In this case, clear and convincing evidence supports the conclusion of the trial court that the termination of Mother's parental rights was in the best interest of the Children. We therefore affirm the termination of Mother's parental rights.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for such further proceedings as may be necessary. The costs of the appeal are taxed to the appellant, Ebony C. L.

_____
JOHN W. McCLARTY, JUDGE